## CIRCUIT COURT OF THE CITY OF RICHMOND

CK-Klein-MacFarlane # 2(A),
Limited Partnership, etc.

v.

City of Richmond and
Director of Finance
of the City of Richmond

July 15, 1993

Case Nos. LT-4594–3, LT-4595–3, LT-4596–3

BY JUDGE MELVIN R. HUGHES, JR.

These are three cases consolidated for trial seeking to correct City of Richmond real estate tax assessments claimed to be erroneous pursuant to statutes made and provided for this purpose. Under § 58.1–3984 "[a]ny person assessed with local taxes, aggrieved by any such assessment, may . . . within three years from the last day of the tax year for which any assessment is made, apply for relief to the circuit court of the county or city wherein such assessment was made." Pursuant to § 58.1–3987, "the court may order that the assessment be corrected and that the applicant be exonerated from the payment of so much as is erroneously charged," § 58.1–5987 continues providing, "[f]or the purposes of reducing or increasing the assessment and adjusting the taxes, the court shall have all the powers and duties of the authority which made the assessment complained of . . . ."

Plaintiff, CK-Klein-MacFarlane, is a limited partnership which owns industrial properties located between Commerce Road and Interstate 95 in the City of Richmond known as Southpark I, II, and III. The tax years in question are 1990, 1991, and 1992. In each of the years, the tax assessments were the same as follows:

| Property | Assessed Value | Assessed Tax Liability |
|----------|----------------|------------------------|
| Southpark I | $3,945,000.00 | $24,017.00 |
| Southpark II | $1,175,000.00 | $17,155.00 |
| Southpark III | $1,645,000.00 | $24,017.00 |

By the evidence adduced at the trial, the gravamen of CK-Klein's complaint is that the City of Richmond failed to take account of ground water contamination at the properties occurring since 1989, in determining the assessments.

Charles MacFarlane, a partner in CK-Klein, testified the partnership is a real estate development firm. Southpark I, II, and III are properties located adjacent to E. I. DuPont deNemours & Co. Spruance plant. In December, 1989, DuPont announced that it had contaminated its groundwater with four toxic chemicals. Migration of the chemicals caused contamination of CK-Klein's properties as well. MacFarlane testified that as a result of DuPont's announcement, CK-Klein was unable to refinance Southpark I and II to lock in a long term interest rate. In addition, a commitment for permanent financing of Southpark III was withdrawn as a result of the contamination, and numerous other financing attempts were unsuccessful. MacFarlane also stated that the contamination has affected the marketability of the properties because of the stigma attached to environmental contamination. While CK-Klein is not actively marketing the properties at this point, MacFarlane said that there have been inquiries, all of which ended at the mention of contamination. Since the announcement of the groundwater contamination, DuPont has instituted remediation efforts which are ongoing, which include extraction and monitoring wells and a treatment plant. There is no dispute that groundwater contamination of the CK-Klein properties exists. There is also no dispute that the tenants on the properties do not use the groundwater for drinking or for industrial purposes and that none of them have left due to the contamination.

According to the City's responses to requests for admissions put in evidence at the hearing, to arrive at the assessments, the "Assessor's Office gives consideration to actual rent and net income but is permitted to, and does, base its assessment upon uniform 'economic' or market criteria bases upon comparable properties within the City." (Admission # 19.) In other words, "[i]n those cases where a property is earning actual rent or net income above, or below, its 'economic' level,

the City is permitted to, and does, uniformly base its assessment on economic criteria." (Admission # 26). In addition to using the "economic rent" in its assessment calculation, the evidence revealed the City also applies a capitalization rate, which is in effect an assessment of risk, or an estimate of what an investor would demand as a rate of return on a real estate investment of the type at issue. The capitalization rate applied to CK-Klein's properties was a base rate of eleven per cent, to which was added the City's tax rate of one and fifty-three hundredths per cent, for a total capitalization rate of twelve and fifty-three hundredths per cent. This methodology used by the City is direct-capitalization via the income approach. CK-Klein contends that in order to properly recognize the increased risk of investing in contaminated property, the City should have adjusted the base capitalization rate upwards four per cent, for a base rate of fifteen per cent and a total of sixteen and fifty-three hundredths per cent. The income figure is divided by the capitalization rate. Thus, applying a higher adjusted rate would decrease the assessed value of the properties and thereby reduce the tax liability.

The City, on the other hand, while agreeing that the assessments have not recognized the contamination, argues that since there is no evidence of any health problem due to contamination and no evidence that the contamination has affected use of the property, no adjustment in the assessment is in order. The city contends that if an adjustment is allowed, four per cent is too great because conditions at the site are not severe. The court accepts CK-Klein's position in part and rejects the City's.

The City used a method of direct capitalization of economic or fair market rents, an income approach, to determine the assessment. The parties have stipulated to the fair market values of the properties without taking the contamination into account. The concern here is what adjustments if any should be made to the assessments to account for any risk on market value. There was evidence through a real estate appraiser that the "real estate market is scared to death" of environmental problems affecting land. There are a number of detriments he cited affecting marketability, including the high potential for (1) limiting investors, (2) limiting leveraging, (3) potential of lawsuits by employees, (4) legal liability, (5) unknown expenses, (6) liability insurance, (7) monitoring costs, (8) neighborhood stigma, (9) cleanup costs, (10) changing regulations. While here the fact that DuPont is

managing the clean-up effort at no cost to plaintiff is a factor to be considered, the mere existence of contamination on the site is a market determinant which by the evidence makes the property difficult to finance which in turn translates to decreased marketability. The former City Assessor testified that the contamination would pose an increased risk such that the capitalization rate would have to be adjusted to meet it. He testified that the capitalization rate is generally between ten and sixteen per cent and that depending on the severity of the contamination, anywhere from two per cent to ten per cent over the normal would be in order to meet the circumstances here.

Considering that the contamination here has not and is not expected to affect operations on the property itself, is contained well below the ground surface, and is being extracted by DuPont at no cost to others, it is the Court's opinion that there should be a minimum additional adjustment to the capitalization rate at this time. That additional adjustment should be at two per cent, for a base rate of thirteen per cent and a total of fourteen and fifty-three hundredths per cent.